IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RONDA GAINES,                          :
                                       :
        Plaintiff,                     :        CIVIL ACTION FILE NO.
                                       :
vs.                                    :
                                       :        1:12-CV-03318-JEC
AETNA INC.,                            :
AETNA LIFE INSURANCE                   :
COMPANY and                           :
AETNA INC. LONG-TERM                   :
DISABILITY BENEFITS PLAN,              :
                                       :
        Defendants                     :

PLAINTIFF'S BRIEF IN SUPPORT OF HER MOTION FOR
TRIAL/JUDGMENT ON THE PAPERS

FACTS

        Plaintiff  Ronda Gaines, a care management consultant (i.e. nurse

consultant) commenced her employment with Aetna, Inc. in the fall of 2006.

Administrative Record (hereinafter, "AR") 54.[1]  As part of her employer's

sponsored benefits, she was afforded various plans including short and long term

disability, health, life insurance, etc...  On December 17, 2009, Ms. Gaines stopped

working and filed a claim for short term disability benefits.  AR 1385. Plaintiff

_____

[1] Defendants have indicated they will file the administrative record, which has been bates
stamped by defendants.

returned to work for a short period of time in late January/early February, 2010 (2 weeks) and then remained off work. AR 1381.   Her short term disability benefits were approved for the maximum period of time (180 days); however, her long term disability (hereinafter "LTD") benefits as well as waiver of life insurance premiums were denied.  AR 974 and 977.  After following the administrative appeal process as well as an additional voluntary appeal for the LTD claim, this lawsuit ensued.

<u>BACKGROUND</u>

Plaintiff claimed disability in part due to systemic lupus erthematosis (hereinafter, "SLE"), fibromyalgia, hypothyroidism with periodic episodes of hypocalcemia, depression, chronic pain, etc... SLE or lupus, is a chronic inflammatory disease that occurs when your body's immune system attacks your own tissues and organs.  Inflammation caused by lupus can affect many different body systems - including your joints, skin, kidneys, blood cells, brain, heart and lungs.  The most common signs and symptoms include fatigue and fever, joint pain, stiffness and swelling, butterfly rash on the face, skin lesions, fingers and toes that turn white or blue, shortness of breath, chest pain, dry eyes, headaches, confusion and memory loss.  Exhibit 1 (a),  Behrman Affidavit, Mayo Clinic. Fibromyalgia is a disorder characterized by widespread musculoskelatal pain

2

accompanied by fatigue, sleep, memory and mood disorders. Exhibit 1(b), Mayo Clinic.

Aetna, Inc. (hereinafter, "AETNA")is the plan administrator for the Aetna Inc. Long Term Disability (hereinafter, "LTD") Benefits Plan.  Aetna Life Insurance Company (hereinafter, "ALIC") is the claims administrator for the LTD plan. The disability plan is self insured by Aetna.  ALIC is the insurer and claims administrator for the life insurance plan. AR 26 and 934.

Medical Analysis

1.   <u>Dr. Reginald Fowler (Attending Physician's Reports)</u>

ALIC requested various attending physician's statements from Dr. Fowler, plaintiff's primary care physician (internist).  On January 11, 2010, Dr. Reginald Fowler, plaintiff's treating physician, indicated plaintiff was disabled from December 17, 2009 because of a viral illness, lupus flare up and sinusitis. AR 329. Dr. Fowler, at that time, believed Ms. Gaines could return to work shortly; however, Ms. Gaines was hospitalized at Piedmont Hospital on January 13 and from January 18 through January 20, 2010. AR 174-183.  On January 25, 2010, Dr. Fowler indicated Ms. Gaines was suffering from gastroenteritis, SLE, intractable nausea, vomiting and chronic pain.  At that time, Dr. Fowler believed plaintiff could return to light duty activity, i.e. eight hours per day, four days per

3

week.  AR 331.  After returning to work for approximately two weeks, plaintiff was seen at the emergency room at St. Joseph's Hospital.  Dr. Fowler, on February 4, 2010, indicated a diagnosis of pleurisy, et. al, and expected her to return to work on February 15, 2010 with sedentary restrictions, i.e. eight hours per day, four days per week.  Dr. Fowler also noted right knee pain as well as indicating "this is a continuation of her recent disability."  AR 333.  On February 16, 2010, Dr. Fowler indicated Ms. Gaines had chronic diarrhea, sle, fatigue, joint pain, right knee pain and resolving pleurisy.  He noted the clinical findings of arthritis, PIP's right hand and various diagnostic tests including gastric erosions in the stomach as evidenced on endoscopy.  Dr. Fowler indicated Ms. Gaines was expected to return to work on March 16, 2010 and restricted her to no heavy lifting, stooping, squatting, sitting for long periods of time, working 8 hours/day, four days per week.  AR 353.  On March 15, 2010, Dr. Fowler indicated Ms. Gaines' diagnosis was SLE with chronic arthralgies, thrush (?), thyroid nodule, joint pains especially hand and ankles.  At that time, Dr. Fowler believed Ms. Gaines was not capable of working because of chronic pain and expected her to return to work on April 16, 2010.  AR 392.  On April 13, 2010, Dr. Fowler indicated Ms. Gaines could not return to work and expected Ms. Gaines to return to work on July 1, 2010.  AR 392.  On June 30, 2010, Dr. Fowler indicated a diagnosis of SLE, hypothoridism

4

and hypoparthyroid and noted Ms. Gaines' had post operative complications from her thyroidectomy performed on May 26, 2010.  Dr. Fowler did not give an expected return to work; however, he completed the capabilities and limitations worksheet Aetna requested (showing occasional sitting, lifting less than 10 pounds, etc...). AR 427-430.  On August 19, 2010, Dr. Fowler noted Ms. Gaines' "SLE has caused difficulties with chronic pain particularly in the legs and ankles. She is significantly impaired because of the pain and has difficulty sitting or standing for prolonged periods. In addition, she has chronic fatigue as a result of collagen vascular disease...She recently had surgery and a partial thyroidectomy with complications of severe hypocalcemia as well as subsequent development of hypothyroidism.  However, the fatigue from her lupus coupled with the fatigue from the hypothyroidism has caused even more of an impairment with respect to her ability to perform her job functions but also her activities of daily living have been affected.   At the present time, she is incapable of performing her duties at work.  AR485.  In June, 2011, Dr. Fowler, in a physician questionnaire, indicated diagnosis of SLE, fibromyalgia, hypothyroidism with periodic episodes of hypocalcemia, depression, renal disease with proteinuria, pseudotumor cerebri, hypothyroidism, etc...  Dr. Fowler noted objective findings of multiple trigger points consistent with fibromyalgia, ankle tenderness bilateral with intermittent

5

edema, flat affect and subjective findings of chronic low back and lower extremity

pain, intermittent lower extremity swelling especially ankle areas and chronic

fatigue.  Additionally, Dr. Fowler noted the medications (zanaflex, phernagen,

oxyxontin, flupxetine, synthroid, percocet, plaqueril, prednisone, etc...)

contributed to Ms. Gaines' fatigue, that the pain affected her ability to maintain

concentration in daily activities and work procedures and that Ms. Gaines was not

capable of working 40 hours/week, that she could not perform the material duties

of her own occupation for more than half the day and that her condition would not

change and that she would never be able to return to work in her occupation as a

nurse care consultant.  AR 171-173.[2]

>        2.        Resurgens Orthopaedist

Office Notes from 2/23/10 indicate right knee moderate degenerative joint

disease, right knee pain, multiple medical problems to include lupus. Office note

from 12/20/10 indicates problems with walking for more than 5 minutes and an

impression of bilateral patellofemoral knee pain, extensive debilitation, bilateral

lower extremities. Dr. Hanna believed Ms. Gaines' muscles have gotten weak to

---

[2] The administrative record also includes over twenty office notes from Dr. Fowler.  See AR 93-170.  As early as March 10, 2010, Dr. Fowler indicated Ms. Gaines' chronic complaints could possibly render her unable to work on a permanent basis.  The various office notes mention edema, tenderness to the spine, hand and feet pain, knee pain, low back pain, use of a wheelchair, not able to do normal activities, etc.

the point that her knees are not supporting her daily activities. AR 73-91.

3. <u>Dr. Dockery</u>

Performed left subtotal thyroidectomy with intraoperative nerve monitoring on May 26, 2010.  Also his records note post surgical complications, mainly with the calcium levels being inadequate. AR 386-390.

4. <u>Functional Capacity Evaluation by Marc Yeager</u>

Performed on May 20 and 23, 2011: Conclusion: Ms. Gaines would not be able to tolerate seated work activities for more than an occasional frequency of more than 33% of the workday.

Additionally:    Does not meet sedentary work because of inability to handle up to 10# of force for a frequency of occasionally or up to 33% of the workday, unable to tolerate sitting for "most of the time" or more than 50% of the workday with an upright, neutral trunk posture appropriate for performing work activities while seated.  AR 187-209.

5. <u>Peer Reviews (MES)</u>

a) <u>Dr. Mark Borigini</u>         10/13/10

"Based on the information reviewed (Aetna referral form and Dr. Fowler's notes), as of June 28, 2010, the claimant is/was able to function at a sedentary physical demand of 8 hours per day.  On October 25, 2010, Dr. Borigini spoke with Dr. Fowler and Dr. Fowler indicated Ms. Gaines was disabled due to chronic pain.

However, Dr. Borigini indicated that the conversation did not change his opinion that the claimant was able to function. AR 215-221.

   b) <u>Dr. Ibrahim Alghafeer</u> 8/29/11

 "From a rheumatolology perspective and based on the available documentation, it is my professional opinion that the claimant has had no physical impairment to prevent her from working at a sedentary level (own occupation).[3] Dr. Alghafeer indicated the records did not indicate excessive day time sleepiness or fatigue that would affect Ms. Gaines' ability to drive, balance, stand or walk.  In summary, her fibromyalgia is not of such severity to render her disabled." AR 298-302.  Apparently, Dr. Alghafeer did not notice Dr. Fowler's office notes that indicated the following: a) 8/19/10 office note where Ms. Gaines indicated she requires assistance from her son to different parts of the house (AR 146), b) 2/24/11 office note that indicated Ms. Gaines was in bed 24-48 hours (AR 111) , 6/3/11 office note that Ms. Gaines came in by wheelchair (AR 93) or even Ms. Gaines' statement indicating that she was in bed 18 hours per day.  AR 657-658.

   c) <u>Dr. Siva Ayyar</u> 8/25/11

 "The claimant does not have continuous functional impairment during the

---

[3] Dr. Fowler also spoke with Dr. Alghafeer.

time frame in question, namely June 28, 2010 through August 12, 2011."[4]  Dr.

Ayyar indicated that "restrictions represent activities that a claimant physically

cannot perform secondary to bona fide structural or functional deficits (i.e. a

claimant with a lesion in the spinal cord may have associated lower extremity

weakness rendering him incapable of heavy lifting).  Restrictions represent those

activities that a claimant should not perform secondary to heightened risk; i.e. a

claimant with uncontrolled epileptic should not drive secondary to a possible risk

of seizure occurring while driving, posing a substantial risk both to the claimant

and to other drivers.  Ms. Gaines does not have such restrictions or limitations.  She

may very well have become deconditioned secondary to long absence from the

workplace, depression, immobility, etc...However, Ms. Gaines is not functionally

impaired as defined by the claims administrator...Ms. Gaines' constraints are not

the result of bona fide functional or anatomic impairments; rather, they are the

results of long deconditioning, long absences from the workplace, poor tolerance to

pain, individual motivation level and individual desire to work...Pain, however, in

and of itself, should not be a debilitating or disabling condition...It is unclear

whether Ms. Gaines' chronic pains, thus, are the results of an idiopathic chronic

pain syndrome, fibromyalgia, lupus or depression.  It may very well be that

---

[4] Dr. Fowlwe also spoke with Dr. Ayyar

depression is the underlying issue here...A special sit/stand accommodation would assist the claimant in returning to work...Ms. Gaines' purported inability to work is not, in conclusion, a function of her medical diagnosis; it is, rather, a function of her individual desire/motivation of work." AR 306-311.

6.    Hospitalizations

Ms. Gaines was hospitalized at Piedmont Hospital on January 13 and January 18-20, 2010.  The primary diagnosis was myalgia with additional diagnosis of arthralgia, dehydration, nausea, vomiting and diarrhea.  The discharge diagnosis was intractable nausea and vomiting, abdominal pain, chronic diarrhea, SLE, chronic pain syndrome, unintentional weight loss (80 pounds), history of IBS and tobacco abuse.   On May 26, 2010, a left subtotal thyroidectomy was performed and there were hypocalcemia complications (calcium levels were inadequate). After being discharged, Ms. Gaines was readmitted forty eight hours later, as her calcium levels had dropped causing parastheisa and pain in the extremities. AR 174-186.

On November 10, 2010, plaintiff was admitted to Emory Johns Creek Hospital because of low calcium levels.  Again, her symptoms include parasthesia, numbness, pain and cramps.  In her history, Ms. Gaines noted that she has had 5 or 6 of these before with two hospitalizations.  Further, the physicians also indicated

she had symptoms consistent with sjorgen syndrome (dry eyes and dry mouth with resulting multiple jaw surgeries for tooth erosions). AR 272-295.

ALIC's Evaluations

ALIC processed Ms. Gaines' short term disability claims noting the various attending physician's reports by Dr. Fowler.   During the investigation, ALIC noted Plaintiff's normal work schedule was four days per week for ten hours per day. AR 1337.   On April 14, 2010, ALIC's nurse reviewer, Natalie Leighton, indicated Ms. Gaines's ongoing lupus symptoms and continued treatment, including renewed pain medications,  as well as pending thyroidectomy,  and restrictions & limitations it is reasonable for functional capacity to remain impaired through [plaintiff's] next office visit (5/13/10) as employee's symptoms are constant and aggravated not only by activity but also by sitting.  AR 1370.  A few weeks later, ALIC extended the short term disability through the end date of the short term disability period, i.e. June 27, 2010. AR1367.

In June, 2010,  ALIC transitioned this matter to the long term disability department.  On August 2, 2010, ALIC denied the long term disability claim by indicating that the medical information did not support functional impairment that would impair Ms. Gaines from performing her own sedentary occupation.  AR 460. The underlying reason for ALIC's denial was an opinion by its nurse reviewer

Gloria Hoehne on June 23 and July 26, 2010.  AR 1398, 1404.  Nurse Hoehne's

opinion indicated that the information provided did not support/establish physical

impairment from a sedentary position.[5]   On August 24, 2010, after reviewing

some lab results, Nurse Sheila Reid indicated that the lab results did not change

ALIC's opinion. AR 1394.

On August 10, 2010, plaintiff Gaines appealed on her own and noted that not

only had the post-operative issues caused great difficulties in her day to day life,

but the chronic pain and lupus have also gotten worse in her ability to do everyday

functions. AR465.

On November 2, 2010, ALIC denied the administrative review based

primarily on Dr. Borigini's review.[6] AR 1387.   On December 2, 2010, plaintiff

Gaines wrote to ALIC and noted that ALIC declined her physician's request for an

independent medical examination, that she spent 18 hours or more in bed, her back

was excruciating with long or short time sitting, lying did not relieve the pain, her

legs swelled whenever there was a prolonged amount of sitting, chronically

fatigued, lost 85 pounds in the last year, oral torture due to SLE (dental problems),

---

[5]ALIC indicated that the policy defined disability as your inability to perform the material duties of your own occupation for more than half a day.

[6] ALIC now indicated that the definition of disability was that you or your doctor must provide evidence that you are unable to perform the material duties of your own occupation.

12

can't feel her hands, fell two times, her cognitive ability had been affected some days, used a cane, etc...AR 657-658.  On December 7, 2010, ALIC indicated that if Ms. Gaines could provide compelling information to justify a reconsideration review, then a reconsideration could be a possibility.  AR 212.  Plaintiff's counsel then became involve and after reviewing the records and plan documents, obtaining additional records and a functional capacity evaluation requested ALIC to reopen and review its November 2, 2010 decision.  AR 71.  ALIC agreed to reopen the case; however,  by letter of September 12, 2011, ALIC still maintained its denial of the long term disability claim based primarily on the peer reviews by Dr. Alghafeer and Dr. Siva Ayyar.  AR 257-260.

<u>Job Description and Earnings</u>

At the time of her disability, Ms. Gaines was earning $27.75/hour and worked forty hours per week. AR 402.[7]   According to Aetna, the physical requirements of the job required occasional reaching above shoulder level, continuous forward reaching, occasional carrying up to five pounds, frequent bending, frequent lifting, frequent fine manipulation, occasional gross manipulation, continuous repetition, continuous sitting, occasional standing, using

---

[7]Occasional requires 1-33% (.5 - 2.5 hours), frequent requires 34-66% (2.6 - 5.0 hours) and continuous requires 67-100% (5.1 - 8 hours) per workday.

a computer 99% of the time and working 7-9 hours per day.[8]   AR 410.  Plaintiff in

her application as well as phone calls to ALIC indicated she sat for 10 to 12 hours

per day working on the computer and telephone. She indicated she could not sit but

for short periods of time, typing was difficult, she tired easily and could not feel her

hands or feet. AR 421.

The LTD Plan

For all relevant times herein, Aetna Inc's LTD benefits plan, dated January 1,

2008 is the pertinent plan.

- ¶ 1.10 defines disability as a condition that, in the opinion of the plan administrator on the basis of information provided by an eligible employee's physician and any other medical professionals with whom the plan administrator consults, causes an eligible employee to be unable to perform the material duties of his own occupation.

- ¶ 1.13. states that disability means with respect to any eligible employee, that he is unable to perform the material duties of his own occupation with the employer as a result of a disability; provided, however, that an individual will be considered disabled following the date that is 18 months after the first day of his disability period [after the 180 day elimination period] only if his disability prevents him from performing any reasonable occupation (i.e., unable to perform any work for which he is otherwise qualified on the basis of his education, training or experience.

- ¶ 1.25 indicates that medical certification means with respect to any

_____

[8] See complaint paragraph four (4) and answer thereto where defendants admitted that more than 95% of plaintiff's sedentary occupation was spent sitting, talking on the phone and working at a computer.

period of absence from work, certification that is satisfactory to the plan administrator from a licensed, qualified physician to the effect that the eligible employee is unable to perform the material duties of his own occupation during such period as a result of illness or injury. Such certification must include objective signs and symptoms, results of diagnostic tests, regimen of treatment, physical modalities, or disability restrictions and limitations.

- ¶ 1.29 defines continuous disability as an uninterrupted period of absence from work documented by a medical certification. In addition, all separate periods of absence due to the same or related illness or injury that are separated by 90 calendar days or less shall be considered a period of continuous disability.

- ¶ 3.1 and 3.2 indicates that Aetna, Inc is the plan administrator and indicates that "the administrator shall have such duties and powers as may be necessary to discharge its duties hereunder, including, but not by way of limitation, the following: (a) to construe and interpret the plan, decide all questions of eligibility, determine the status and rights of eligible employees and disabled employees, and determine the amount, manner and time of payment of any benefits hereunder." Further, the plan indicates that the company shall be the administrator and, as such, the named fiduciary with the sole responsibility for the administration of the plan. The administrator may delegate to any person or entity any powers or duties of the administrator under the plan." AR 1-22.

The Summary Plan Description indicates that the benefits are not insured with ALIC but will be paid from the employer's funds. Further, the SPD defines disability as not being able to perform the material duties of your own occupation for more than half a day...and after the first 24 months of a period of disability, you will be disabled if you are not able to work at any reasonable occupation. AR 23-

49.

Aetna LTD Benefit Plan also indicates that an election of medical and dental coverage at employee rates for the first 30 months of disability is permitted. AR 13.

## ARGUMENT AND CITATION OF AUTHORITY

### STANDARD OF REVIEW

29 U.S.C. § 1132 (a) (also known as Section 502 (a) ) is the applicable ERISA statute concerning the merits of this case.   Section 502(a)(1)(B) provides that a participant or beneficiary may bring a civil action to recover benefits due to him under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S.Ct. 2343, 2346, 171 L.E.2d 299 (2008).

In Firestone Tire & Rubber Co., v. Bruch, 489 U.S. 101, 109 (1989), the Supreme Court noted Congress did not indicate a judicial standard for reviewing decisions of plan administrators or fiduciaries provided in ERISA and noted:

> "(1) In determining the appropriate standard of review, a court should be guided by principles of trust law; in doing so, it should analogize a plan administrator to the trustee of a common-law trust; and it should consider a benefit determination to be a fiduciary act (i.e, an act in which the administrator owes a special duty of loyalty to the plan beneficiaries). (2) Principles of trust law requires courts to review a denial of plan benefits *de novo* unless the plan provides to the contrary. (3) Where the plan provides to the contrary by granting the administrator or fiduciary discretionary authority to determine eligibility of benefits, trust principles make a deferential

standard of review appropriate. (4) If a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion."

The 11th Circuit, in attempting to adhere to the Supreme Court's directions, instituted a six step philosophy for use in virtually all ERISA-plan benefit denials, as follows:

1.      Apply the _de novo_ standard to determine whether the claims administrator's benefits-denial decision is wrong (i.e. the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

2       If the administrator's decision in fact is "_de novo_ wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

3.      If the administrator's decision is "_de novo_ wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

4.      If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

5.      If there is no conflict, then end the inquiry and affirm the decision.

6.      f there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Williams v. BellSouth Telecomms., Inc. 373 F. 3d 1132, 1134 (11th Cir., 2004)

(quoting HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co., 240 F. 3rd 982, 993 (11th Cir., 2001).

Initially, the 11th Circuit, when utilizing the 6th step, required the conflicted administrator to bear the burden that the denial was not tainted by the inherent conflict of interest, and, if they could not do so, the court would overturn the administrator's decision. Several years later, the Supreme Court, in Metropolitan Life Ins. Co. v. Glenn, called into question the heightened arbitrary and capricious standard. 544 U.S. 105, 116-17 (2008).  The Glenn court noted it was not necessary or desirable for courts to create special burden of proof rules or other special procedures or evidentiary rules that focused narrowly upon the evaluator/payor conflict.  Thus, the 11th Circuit in Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352 (11th Cir., 2008) modified the 6th step in the Williams analysis and noted "the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." Id. at 1360.  "The burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self interest." Id.

The above six step approach is now an impossible standard and should be modified in accordance with the Supreme Court's view.  In practice, a claimant can

never be successful if all six steps are utilized.  For example, a court would have to first determine the administrator was wrong, second there was discretionary authority, third, the administrator's decision was reasonable, fourth there was a conflict and lastly whether the conflict was a factor to make the decision unreasonable.  In other words, a court would have to determine the administrator was wrong but reasonable and then unreasonable (after considering the conflict as a factor).  The undersigned has no idea how a trial court could determine how an administrator's reasonable decision could be made unreasonable.  The decision is either reasonable or unreasonable.  Further, the court would have to indicate the conflict of interest was **the** factor as opposed to a factor in its analysis.

In Harvey v. Standard Ins. Co., 850 F. Supp. 2d 1269 (N.D. Al., 2012), affirmed on appeal, 503 Fed. Appx. 845 (2013) Judge Hopkins made the following comment: "The court finds that the alleged conflict identified by the plaintiff would not have a determinative effect on the outcome of this particular case because the court has already concluded that independent reasonable grounds supported Standard [Insurance Company's] benefits decision."  Judge Hopkins thus inferred that a reasonable denial will always be reasonable regardless of the extent of the conflict of interest.

Before Harvey, the 11th Circuit in Creel v. Wachovia Corporation, 2009 WL

179584, (11th Circuit, # 08-10961, January 27, 2009), seemed to realize the above

problem and noted <u>Glenn</u> would also affect the wording of the third step because

there would be a single level of arbitrary and capricious review and thus no need to

term it a "more deferential" arbitrary and capricious standard."  However, <u>Creel</u> is

an unpublished opinion, not binding and its reasons were not followed in

<u>Blankenship v. Metropolitan Life Ins. Co.,</u> 644 F.3d 1350 (11th Cir., 2011).

    Plaintiff avers this court should comply with the Supreme Court's language

initially set forth in <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 108-109

(1989) and further analyzed by <u>Glenn</u>.  In other words,  Plaintiff is requesting the

court to determine the 11th Circuit's six step approach to be in violation of the

supreme law of the land.  <u>Marbury v. Madison</u> 5 U.S. 137 (1803) .  In <u>Glenn</u>, the

court reiterated its view and stated the following:

> "A reviewing court should consider that conflict [conflict of interest]
> as a factor in determining whether the plan administrator has abused
> its discretion in denying benefits; and that the significance of the
> factor will depend upon the circumstances of the particular
> case...Ultimately, conflicts are but one factor among many that a
> reviewing judge must take into account...Any one factor might act as a
> tiebreaker when the other factors are closely balanced...and a conflict
> may carry more weight when the circumstances suggest a higher
> likelihood that it affected the benefits decision as when an insurer has
> a history of biased claim administrations...It should prove less
> important (perhaps to the vanishing point) where the administrator has
> taken active steps to reduce potential bias and to promote accuracy, for
> example, by walling off claims administrators from those interested in

firm finances, or by imposing management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits." Glenn 554 U.S. at 117.

Thus, it seems logical for a court to a) first determine whether there is a proper grant of discretionary authority given to the administrator (and if not conduct a de novo review) and  b) if there was a proper grant of discretionary authority,  review the matter under a deferential standard; however, if there was a conflict of interest, the conflict should be a factor.  A more conflicted administrator should be given less deference and a less conflicted administrator should be given more deference.  In other words, the conflict with all the other factors should be considered in determining whether the administrator's decision was reasonable or unreasonable.

## B. Application of the Standard of Review

There seems to be two avenues for the court to conduct a review.  One alternative is to use Federal Rule of Civil Procedure Rule 52 (Findings of Facts and Conclusions of Law) and the other alternative would be by Federal Rule of Civil Procedure Rule 56 (Summary Judgment).

When a decision is based on the agreed-upon administrative record, judicial economy favors using findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, not summary judgment under Federal Rule of Civil

Procedure Rule 56.  <u>Doyle</u> at 1363 n. 5.[9]  Thus, Plaintiff avers this matter can be

analyzed under FRCP Rule 52.

## DISCRETIONARY AUTHORITY

Pursuant to the plan language, discretionary authority has been afforded to

Aetna and, if delegated properly to the claims administrator, ALIC.  However, the

only administrative agreement produced in discovery is a 1990 contract between

Aetna Life and Casualty Company and ALIC.  As no discovery was forwarded

linking Aetna to ALIC or linking the 2008 LTD benefit plan to any administrative

agreement, plaintiff avers that as ALIC was the decision maker and no documents

were produced indicating that Aetna properly delegated its discretionary authority

to ALIC, plaintiff believes this court should hear this matter *de novo*.

Assuming the court finds discretionary authority has been afforded to the

claims administrator, ALIC, then the question becomes whether or not the court

should determine if there was a conflict of interest; and, if there was, how much the

conflict should be a factor.  Plaintiff avers that the claims administrator was

conflicted for the following reasons:

---

[9] Summary judgment is appropriate only if the pleadings, depositions, answers, admissions and any affidavits create no genuine issues of material fact.  Federal Rules of Civil Procedure, Rule 56 (c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material facts.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986).

1.     ALIC was the insurer and administrator for plaintiff's life insurance

disability waiver claim.  Thus, if the long term disability was denied,

then ALIC did not have to waive the life insurance premium.  The

denial of the life insurance waiver premium claim came on September

23, 2010.  AR 974.  If plaintiff died during the period that the life

insurance premiums were waived for disability, plaintiff's

beneficiaries would have received the $174,000.00 life insurance

proceeds. AR 992.

2.     The interest of ALIC and Aetna, Inc. are so closely aligned, the court

should disregard the corporate structure.  Aetna is the parent

corporation to three main subsidiaries, one being ALIC.  These two

companies share the same officers, and, Aetna Inc.'s 2012 annual

report indicates the following:

> -     Our three business segments are distinct businesses that
>       offer different products and services.  Our Chief
>       Executive Officer evaluates financial performances and
>       makes resource allocation decisions at these segment
>       levels...The accompanying consolidated financial
>       statements have been prepared in accordance with U.S.
>       generally accepted accounting principles ("GAAP") and
>       include the accounts of Aetna and the subsidiaries that we
>       control. ..Our business operations are conducted through
>       subsidiaries that principally consists of HMOs and

insurance companies.   Exhibit 1(c), Annual Report .[10]

- Aetna is the brand name used for products and services provided by one or more of the Aetna group of subsidiary companies, including Aetna Life Insurance Company. Exhibit 1 (d).[11]

3.     Aetna's advertisement indicates that if ALIC is utilized, employers may reduce average claim costs by about $1074 per claim and get employees back to work at an average of 4.72 days sooner.  Aetna Long Term Disability plan "cut costs and get employees back to work." Exhibit 1 (e).

4.     Aetna's  improper history.  See Exhibit 1 (f).

Given the above, plaintiff avers that if discretionary authority has been properly delegated to ALIC, then a conflict of interest has been established and the court should weigh the conflict as a factor in determining whether or not there has

---

[10] In Kuntz v. Aetna, Inc, (USDC - EDPA., Case # 10-cv-877, May 17, 2013)  the court concluded there was no conflict of interest between Aetna, Inc and Aetna Life Ins. Co as the court was not presented with any evidence of the relationship between Aetna, Inc and Aetna Life Insurance Company other than that Aetna Life Ins Co was the claims administrator.  But see, Vega v. National Life Ins. Services and Pan-American Life Ins Co., 188 F.3d 287 (5th Cir., 2000) where the court indicated there was a conflict of interest when the claims administrator was the subsidiary of the self insured parent corporation.

[11]  The 11th circuit has established various factors to determine whether or not a parent corporation was the alter ego of a subsidiary, including common stock ownership, common directors/officers, common business departments, whether consolidated financial statements were used, whether the parent finances the subsidiary, whether the parent caused the incorporation of the subsidiary, etc...United Steelworkers of America v. Connors Steel Company, 855 F.2d 1499 (1988).  All of the above factors listed are positive to determine the alter ego doctrine.

been a reasonable or unreasonable decision concerning the denial of plaintiff's long term disability claim. Since Aetna advertises that ALIC saves employees over a $1,000.00 per claim, this court should review ALIC's decision with some degree of deference but not a great deal of deference.

Discussion

While it is not disputed that Ms. Gaines has multiple medical problems, including SLE, fibromyalgia and chronic pain (syndrome), the main question before this court is whether or not Ms. Gaines meets the definition of disability under the LTD plan.  The LTD plan defines disability as being unable to perform the material duties of one's own occupation. Occupation is not defined in the LTD plan, however, the summary plan description defines own occupation as the occupation you are routinely performing when your period of disability begins. AR 44. The only information in the administrative file of a care manager consultant reflects Aetna's statement as well as Ms. Gaines' statement.  Although there are some minor differences, the main duties of her job require constant sitting (employer 7-9 hours sitting, employee 10-12 hours sitting per day) and constant repetition (computer typing).[12]

---

[12]  The DOT would describe said job as sedentary (which would require frequent sitting as opposed to constant sitting); however, the DOT is simply a guide and Aetna did not rely on the DOT concerning its decision.

In reviewing the short term and long term disability claims, ALIC made different decisions based upon the same set of facts.  The only difference between the short term and the initial long term decision was that ALIC employed different nurses to review the file. Specifically, it seems the short term disability nurse included subjective complaints into her analysis and the long term disability nurse did not. Two different opinions by the same company based upon the same set of information is arbitrary. Additionally, on the administrative voluntary appeal, the differences between the treating physician's opinion as well as the peer reviewing physicians' opinions seems to be based also on whether one factors in subjective complaints and/or chronic pain (syndrome).  The peer review physician, Dr. Ayyar opined that only bona fide structural or functional deficits should be used to determine disability and then Dr. Ayyar described those situations.  Thus, it appears Dr. Ayyar's would never opine that anyone was disabled from a sedentary occupation as a result of fibromyalgia, chronic pain (syndrome), etc... as it would be impossible to satisfy Dr. Ayyar's definition of bona fide structural deficits or functional deficits.  The LTD plan does not limit proof of disability to Dr. Ayyar's beliefs as it also includes regimen of treatment, physical modalities, or disability restrictions and limitations. AR 8.

In the 11th Circuit, a benefit plan administrator may not arbitrarily refuse to

26

credit a claimant's reliable evidence, including opinions of a treating physician.

Black & Decker Disability Plan v. Nord, 538 US 822, 834 (2003).  Denial of a

benefit claim based on conflicting but reliable evidence is permissible, but relevant

evidence may not be ignored to reach a desired conclusion.  Oliver v. Coca-Cola,

497 F.3d 1199 (11th Cir., 2007), rehearing granted, 497 F. 3d 1181 (2007), affirmed

in part/reversed in part 546 F. 3d 1353 (2008). In Giertz-Richardson v. Hartford

Life and Accident Ins. Co., 536 F. Supp. 2d 1280 (M.D. Fl., 2008), the district

court noted that an administrator cannot automatically disregard subjective

complaints. Traditionally, laboratory and other quantitative medical testing, such as

MRIs, CAT Scans, and functional impairment tests are considered objective

medical evidence.  Oliver v. Coca Cola,.  In Lee v. Bellsouth Telecommunications,

Inc., 318 Fed. Appx. 829 (11th Cir., 2009), the court noted that a consistent

diagnosis of chronic pain syndrome along with consistent observations of physical

manifestations of the diagnosis do in fact constitute objective medical evidence.

This is so because such medical evidence, especially as it relates to pain, is

inherently subjective in that it cannot be quantifiably measured.   Chronic pain

syndrome is a severely debilitating medical condition that may be fully diagnosed

only through long term clinical observation.[13]  ALIC, in this particular case,

---

[13] The AR indicates records from 2008 of chronic pain. AR 323 - 328.

ignored all evidence of Ms. Gaines' chronic pain (syndrome) when it relied on the peer reviewers' opinions and/or evaluating the long term disability claim.

Notwithstanding the above, even for subjective factors that are part of the symptoms of a medical diagnosis, it is reasonable to expect evidence of an inability to work. See Creel v. Wachovia. Although Dr. Fowler's disability restrictions and limitations fulfill the LTD plan's provisions for disability, Ms. Gaines also underwent a functional capacity evaluation. "A FCE is used to define an individual's functional abilities or limitations in the context of safe, productive work tasks and consists of a series of test activities to measure whether an individual has the ability to meet the required job demands."  An FCE is often considered the best means of assessing an individual's functional level. Stiltz v. Metropolitan Life Insurance Company, 2006 WL 2534406 (N.D. GA, 2006), affirmed 244 Fed. Appx. 260 (11th Cir., 2007),  citing Bressmar v. Federal Express Corp., 213 F. 3d 625 (2nd Cir., 2000),  Fick v. Metropolitan Life Ins. Co., 347 F. Supp. 2d 1271, 1280 (S.D. Fl., 2004) and Lake v. Hartford Life and Accident Ins. Co., 320 F. Supp. 2d 1240, 1249 (M.D. Fl., 2004). While the FCE showed self limited effort during the performance of hand coordination activities  (concerning lifting and carrying), the FCE evaluator noted that all other activities was performed with maximal effort.  Ms. Gaines' tolerance for performing computer

work activities was limited by her decreased tolerance for sitting statically that

presented with frequent postural adjustment and report of increased low back and

lower extremity symptoms.  AR 192.

Further, Dr. Fowler's office notes indicate problems related to pain, edema,

fatigue, spine tenderness, ankle tenderness, finger tenderness, multiple trigger

points, decreased range of motion, swelling, knee problems, calcium deficiencies,

diagnostic tests such as x-rays, laboratory results, etc...ALIC's eventual decision to

deny the LTD was based on its peer reviewing physician who stated the following:

> "Ms. Gaines' constraints are not the result of bona fide functional or
> anatomic impairments; rather, they are the results of long deconditioning,
> long absences from the workplace, poor tolerance to pain, individual
> motivation level and individual desire to work...Pain, however, in and of
> itself, should not be a debilitating or disabling condition...It is unclear
> whether Ms. Gaines' chronic pains, thus, are the results of an idiopathic
> chronic pain syndrome, fibromyalgia, lupus or depression."

Since Dr. Ayyar seems to believe Ms. Gaines has chronic pain, ALIC should

have analyzed the long term disability claim to include, at a minimum, subjective

factors such as chronic pain and/or a diagnosis of chronic pain syndrome along

with the objective factors.  ALIC's failure to factor in Ms. Gaines' chronic pain

and/or chronic pain syndrome concerning the LTD claim is wrong and

unreasonable.   A few months ago, in Kuntz v. Aetna, Inc. (E.D.PA., Case # 10-cv-

877, 5/17/13,  2013 WL 2147945), the district court found ALIC's decision to

ignore subjective factors in a long term disability case to be arbitrary and capricious.

<u>CONCLUSION</u>

This court should first determine that Aetna maintained a conflict of interest and that the conflict is a significant factor, especially as Aetna promotes that it can save over a $1,000.00 per disabled individual and get an employee back to work faster.  Second, the court should determine that ALIC's decision was wrong and unreasonable (arbitrary and capricious)  and should grant Ms. Gaines her disability benefits during the own occupation (18 months) period.[14]  Third, the court should remand this case back to Aetna/ALIC for a determination concerning disability beyond the 18 month period as the definition of occupation changes from your "own occupation" to "any occupation."

Respectfully,

By: /s/ <i>Kenneth Behrman</i>
Kenneth Behrman
Attorney for the Plaintiff
Ga. Bar No. 046995

---

[14]  Since Aetna has not yet had a chance to determine the appropriate amounts regarding the payments (there are additional factors that include offsets, potential deductions for medical/dental premiums, etc...), plaintiff would request Aetna be given twenty (20) days to determine the appropriate amount (proposed order) and if plaintiff disagrees, then plaintiff can file an objection with the court.  Also, plaintiff would request additional time, i.e. twenty (20) days to file a motion for attorney fees.

900 Circle 75 Parkway, SE
Suite 1220
Atlanta, GA.  30339-3053
770-952-7770 x 25
ken.behrman@behrmanlaw.com

## CERTIFICATE OF COMPLIANCE AND SERVICE

This is to certify that this filing complies with the font and font size requirements of LR 5.1B (Times New Roman, 14 pt).  Additionally, this is to certify that on September 6, 2013, I filed the foregoing Plaintiff's Brief in Support of her Motion for Trial/Judgment on the Papers using the CM/ECF system, which will automatically notify the following counsel in the foregoing matter by electronic means: Elizabeth J. Bondurant and Aaron E. Pohlmann.

By: /s/ *Kenneth Behrman*
Kenneth Behrman
Attorney for the Plaintiff
Ga. Bar No. 046995

900 Circle 75 Parkway, SE
Suite 1220
Atlanta, GA.  30339-3053
770-952-7770 x 25
ken.behrman@behrmanlaw.com